**SO ORDERED: March 7, 2022.**



**James M. Carr**
**United States Bankruptcy Judge**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| RICHARD VERNON MATTSON, | ) | Case No. 18-09103-JMC-7A |
| | ) | |
| Debtor. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| LAMB MECHANICAL SERVICES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. 19-50068 |
| | ) | |
| RICHARD VERNON MATTSON, | ) | |
| | ) | |
| Defendant. | ) | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS ADVERSARY PROCEEDING came before the Court for a bench trial on

January 13, 2021, March 31, 2021, April 1, 2021 and May 26, 2021 (the "Trial"). Plaintiff Lamb

Mechanical Services LLC ("LMS") appeared by counsel Kathleen Hart and Jaclyn M. Flint.

Defendant Richard Vernon Mattson ("Debtor") appeared by counsel Julie A. Camden. At the

conclusion of the Trial, the Court took the matter under advisement with the parties invited to

submit proposed findings of fact and conclusions of law in lieu of post-Trial briefs.

The Court, having reviewed the evidence presented at the Trial, the *Stipulations for Trial*[1] filed by the parties on October 7, 2020 (Docket No. 59) (the "Stipulation"), *Plaintiff's Trial Brief* filed on October 9, 2020 (Docket No. 61), *Defendant's Trial Brief* filed on February 15, 2021 (Docket No. 65) ("Debtor's Trial Brief"), *Plaintiff's Response to Defendant's Trial Brief* filed on March 30, 2021 (Docket No. 70), the proposed findings of fact and conclusions of law submitted by LMS and Debtor on June 14, 2021 (which the Court treats as post-Trial briefs) and the other matters of record in this adversary proceeding; having weighed the credibility of the witnesses; having heard the presentations of counsel at the Trial and considered their briefs and proposed entries; and being otherwise duly advised, now enters the following findings of fact and conclusions of law as required by Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052.

## Findings of Fact

To assist in making the following numbered findings of fact, the Court ordered and relied on a transcript of the testimony given at, as well as the recording of, the four-day Trial. However, the Court formed impressions regarding the relative credibility of all witnesses contemporaneous with their in-court testimony. The Court has retained and relied upon such impressions formed by listening to live testimony and closely observing the witnesses. The Court has annotated the findings of fact using the Trial transcript and the designated exhibits admitted at Trial. In so doing, the Court has *not* included every citation to the record (transcript and/or exhibits) that support its findings. The Court has cited evidence that it found most credible and convincing, yet the Court did not add other citations that, while supportive, might be

---

[1]     There was a dispute at Trial regarding which documents the parties stipulated would be admissible. Therefore, the Court relied on the designated exhibits admitted on the record at the Trial rather than as referenced in the Stipulation.

redundant or of negligible probative value.  In some but not all instances, the Court has described evidence contrary to a Court finding and how the Court weighed the evidence.

The Court makes the following findings of fact:

1.      On December 5, 2018, Debtor filed a voluntary petition under chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"),[2] in the United States Bankruptcy Court for the Southern District of Indiana, Indianapolis Division.[3]

2.      On March 24, 2020, Debtor received his general discharge.[4]

3.      On March 11, 2019, LMS timely filed its *Complaint for Determination of Dischargeability and Objecting to Debtor's Discharge Pursuant to Sections 523 and 727 of the Bankruptcy Code* (Docket No. 1) to initiate this adversary proceeding.  After the Court ruled on one motion to dismiss (Docket No. 19) and two motions for partial summary judgment (Docket Nos. 49 and 50), LMS filed its *Amended Complaint for Determination of Dischargeability Pursuant to Sections 523 of the Bankruptcy Code* (Docket No. 51) (the "Complaint") on February 18, 2020, wherein LMS alleges that certain claims that LMS asserts against Debtor are nondischargeable under §§ 523(a)(2)(A), (a)(4) and/or (a)(6).

4.      On February 21, 2020, Debtor filed his *Answer to Amended Complaint For Determination of Dischargeability Pursuant to Sections 523 of the Bankruptcy Code* (Docket No. 52), in which he denied all material allegations.

5.      At all relevant times, LMS installed and serviced heating, ventilation, air conditioning, refrigeration, restaurant and plumbing equipment or systems (collectively, "HVAC

---

[2]      All statutory references hereinafter are to the Bankruptcy Code unless otherwise noted.

[3]      Bankruptcy Case No. 18-09103-JMC-7A (Docket No. 1); Stipulation, Fact ¶ 1.

[4]      *Order of Discharge*, Bankruptcy Case No. 18-09103-JMC-7A (Docket No. 56); Stipulation, Fact ¶ 6.

Services") for commercial clients.[5]  LMS was owned by Ed Lamb ("Lamb"), who was responsible for the service and construction operations, and Jay Wilson ("Wilson"), who was responsible for managing accounts payable and payroll and served as the Secretary/Treasurer.[6]

6.    In the fall of 2016, LMS decided to hire a "Service Manager" who would be primarily responsible for overseeing and managing LMS's provision of day-to-day HVAC Services, meeting the needs of its service customers and supervising service technicians.[7]

7.    The person sought for the Service Manager was required to have training and management experience as well as "hands on experience"; a college degree was preferred but not required.[8]

8.    Debtor applied for LMS's Service Manager position.[9]  As part of the application/ hiring process, Debtor represented to LMS that:

a.    Debtor obtained an undergraduate degree from IUPUI.  Debtor does not have a college degree.[10]

b.    Debtor sold his company, Mattson Mechanical, LLC, to Indy Connection Electrical Contractors, Inc. ("Mister Quik") for $1,745,000.  Debtor did not sell his company to Mister Quik.  Debtor gave to LMS a copy of a fake "Business Purchase Agreement" with respect

---

[5]    Transcript of Record Day 2 at 5:11-14, 91:3-93:3, 165:22-166:10 [Lamb Testimony]; Transcript of Record Day 3 at 10:7-10, 46:15-18 [David Jason Wunderlich ("Wunderlich") Testimony]; Transcript of Record Day 1 at 154:5-156:2 [Debtor Testimony].

[6]    Transcript of Record Day 2 at 5:24-6:15 [Lamb Testimony]; Transcript of Record Day 3 at 74:20-75:2, 94:15-95:9 [Wilson Testimony].

[7]    Transcript of Record Day 2 at 6:8-15, 6:19-23, 16:8-16 [Lamb Testimony].

[8]    Transcript of Record Day 2 at 7:6-11 [Lamb Testimony].

[9]    LMS's Ex. 1; Stipulation, Fact ¶ 12.

[10]    LMS's Ex. 1; Stipulation, Fact ¶ 13; Transcript of Record Day 1 at 16:18-19, 25:24-26:6 [Debtor Testimony]; Transcript of Record Day 2 at 12:17-13:9 [Lamb Testimony].

to the purported sale.[11]   The record is unclear as to when the fake "Business Purchase Agreement" was given to LMS (that is to say whether it was provided before or after LMS decided to hire Debtor) and whether LMS requested a copy of such agreement or Debtor offered it.[12]

      c.     Debtor held a license to provide HVAC Services and that Mr. Quik was using his license.  Debtor never held a license.[13]

9.     LMS hired Debtor to serve as LMS's Service Manager.[14]

10.     LMS agreed to pay Debtor $85,000 annually, the salary Debtor requested.[15]

11.     On or about October 2, 2016, Debtor and LMS executed an employment agreement (the "Employment Agreement").[16]  Both LMS and Debtor were represented by counsel in negotiating the Employment Agreement.[17]

---

[11]     LMS's Ex. 2; Stipulation, Fact ¶ 14; Transcript of Record Day 1 at 27:12-29:16 [Debtor Testimony]; Transcript of Record Day 3 at 77:14-78:19 [Wilson Testimony].

[12]     Transcript of Record Day 1 at 27:9-31:22 [Debtor Testimony]; Transcript of Record Day 2 at 7:23-9:19 [Lamb Testimony].

[13]     Transcript of Record Day 2 at 10:4-13 [Lamb Testimony]; Transcript of Record Day 3 at 8:7-20 [Wunderlich Testimony]; Transcript of Record Day 3 at 76:12-24 [Wilson Testimony].  Debtor did not recall making a representation to Lamb or Wilson regarding holding a commercial HVAC license.  Transcript of Record Day 1 at 27:1-8 [Debtor Testimony].   Debtor admitted he never held any professional license related to heating, cooling or refrigeration work.  Transcript of Record Day 1 at 20:5-8 [Debtor Testimony].

[14]     Transcript of Record Day 2 at 7:12-13:14 [Lamb Testimony]; Transcript of Record Day 3 at 75:14-76:24 [Wilson Testimony]; Stipulation, Fact ¶ 15.

[15]     LMS's Exs. 1 and 3; Debtor's Ex. A; Transcript of Record Day 1 at 34:25-35:8 [Debtor Testimony]; Transcript of Record Day 2 at 13:1-5 [Lamb Testimony].  Debtor testified that he was paid $35-$40/hour + overtime at Mr. Quik, $120,00/year at Gordon (as defined below) and $115,000/year at TPC (as defined below).  LMS's Exs. 6 and 8; Transcript of Record Day 1 at 169:2-170:2 [Debtor Testimony].

[16]     LMS's Ex. 3; Debtor's Ex. A.

[17]     Transcript of Record Day 1 at 33:7-13 [Debtor Testimony]; Transcript of Record Day 2 at 8:11-19, 9:8-19, 17:17-19, 19:10-15, 146:7-15 [Lamb Testimony].

12.    The "bonus compensation"[18] section of the Employment Agreement was left substantially blank because there was not a "meeting of the minds" of the parties as to how the amount of the bonus compensation should be calculated and when (and subject to what conditions) a bonus should be paid.[19]

13.    The Employment Agreement included a limited non-compete clause and a non-solicitation clause. The non-solicitation clause prohibited Debtor from soliciting the sale of HVAC Services to customers of LMS and soliciting LMS employees for a 3-year period following Debtor's separation from LMS.  The limited non-compete clause prohibited Debtor from competing in any capacity against LMS for a 3-year period following Debtor's separation from LMS.[20]  At the time the Employment Agreement was executed, Debtor understood those provisions to be unenforceable.[21]  At the time the Employment Agreement was executed, LMS intended the non-compete clause to be applicable to Taco Bell (as defined below).[22]

14.    Debtor was entitled to an automobile allowance of $350 per month.[23]

---

[18]    Throughout the Trial, the "bonus compensation" referenced in the Employment Agreement was often referred to as "commissions".  In this opinion, the terms "commission", "commissions", "bonus" and "bonus compensation" are synonymous.

[19]    LMS's Ex. 3; Debtor's Ex. A.  Debtor testified that Wilson, Lamb and Debtor discussed that Debtor would receive commissions beginning in January 2017 at a percentage rate to be determined at a later time.  Transcript of Record Day 1 at 49:13-51:24 [Debtor Testimony].  Lamb testified that Debtor would not receive bonus compensation until Lamb determined that the work Debtor brought in from Taco Bell was profitable over a year period.  Transcript of Record Day 2 at 17:20-19:19 [Lamb Testimony].

[20]    LMS's Ex. 3;  Debtor's Ex. A.

[21]    Transcript of Record Day 1 at 65:5-66:14 [Debtor Testimony].  Debtor did not testify as to the basis for his understanding that the non-compete and non-solicitation clauses were unenforceable.  In Debtor's Trial Brief, citing *Clark's Sales and Servs., Inc. v. Smith*, 4 N.E.3d 772 (Ind. Ct. App. 2014), Debtor's counsel argued that the three-year duration of the non-compete and non-solicitation clauses made them unenforceable.

[22]    Transcript of Record Day 2 at 8:16-24, 9:20-11:17 [Lamb Testimony].

[23]    The Employment Agreement included an automobile allowance of "$350 per week".  LMS's Ex. 3; Debtor's Ex. A.  The parties agree that the automotive allowance was meant to be on a "per month" basis, not a "per week" basis.  Transcript of Record Day 1 at 35:16-24, 230:10-231:3 [Debtor Testimony]; Transcript of Record Day 2 at 19:20-20:4 [Lamb Testimony].

15.     Debtor began working at LMS on October 3, 2016.[24]

16.     As Service Manager, Debtor was the primary individual responsible for managing LMS's HVAC Services, including LMS's HVAC employees and operations.[25]  Even though Debtor was hired, Lamb continued to be heavily involved in the operations of LMS.[26]  Lamb suggested that Debtor "kept him at bay" regarding Taco Bell,[27] but Lamb also acknowledged that by the time Debtor was terminated as an employee of LMS, Lamb had the names, telephone numbers or other contact information for Taco Bell representatives.[28]

17.     During his employment with LMS, Debtor began using the self-appointed title of "Vice President of Operations", which Debtor gave himself without approval from either Lamb or Wilson.[29]  Debtor was never an owner, officer or director of LMS.[30]

18.     While working at LMS, Debtor established a new Google e-mail suite for LMS utilizing the "@lambmechanicalservices.com" domain name ("Google Domain").[31]  LMS employees, while using the Google Domain, also continued to monitor and respond to emails on

---

[24]     Transcript of Record Day 2 at 200:23-25 [Sherri Kimmel ("Kimmel") Testimony].

[25]     Transcript of Record Day 2 at 16:8-22 [Lamb Testimony]; Transcript of Record Day 2 at 201:3-7 [Kimmel Testimony].

[26]     Transcript of Record Day 2 at 16:17-22 ("as I watched him try to manage this thing, it became very apparent that my lead techs knew more than he did"), 24:22-25:14 ("so, yes, I was involved"), 25:15-18 ("I always had my hands in it"), 25:19-24 ("in the office, you know, I was always asking what's going on, what are we doing, what's going on, who's there, what's getting done, you know, it's a collaborative effort to manage the whole company and I got my hands in everything"), 26:4-10 ("I had a pretty good idea of what was going on every day") [Lamb Testimony].

[27]     Transcript of Record Day 2 at 26:4-27:7 [Lamb Testimony].

[28]     Transcript of Record Day 2 at 26:11-27:12 [Lamb Testimony].

[29]     Transcript of Record Day 1 at 34:8-24 [Debtor Testimony]; Transcript of Record Day 2 at 16:23-17:4 [Lamb Testimony].

[30]     Transcript of Record Day 1 at 165:5-7 [Debtor Testimony].

[31]     Transcript of Record Day 1 at 41:1-17 [Debtor Testimony]; Transcript of Record Day 2 at 209:19-210:4 [Kimmel Testimony].

their "@hotmail.com" email addresses.[32]

19.    During the application/hiring process, the parties discussed Debtor bringing business from a new customer to LMS, namely Flynn Restaurant Group, Inc. d/b/a Bell American Group ("Taco Bell").[33]  As a franchisee, Taco Bell owned and operated around 60 Taco Bell restaurants.[34]  The principal motivation of LMS in hiring Debtor was the desire and expectation of LMS that by hiring him LMS would obtain a substantial amount of HVAC Services business from Taco Bell.  Debtor brought a substantial amount of Taco Bell work to LMS.[35]

20.    LMS did not have a written contract with Taco Bell, and LMS was not Taco Bell's exclusive provider of HVAC Services.  Taco Bell could have stopped using LMS's HVAC Services at any time.[36]

21.    During 2016 and 2017, LMS acquired additional trucks and necessary equipment to deal with the anticipated and actual increase in work from Taco Bell.[37]

22.    Between 2016 and 2017, LMS made gross sales to Taco Bell for HVAC Services

---

[32]    Debtor's Ex. L; Debtor's Ex. M; Transcript of Record Day 1 at 180:3-184:4 [Debtor Testimony]; Transcript of Record Day 2 at 43:7-44:22 [Lamb Testimony]; Transcript of Record Day 3 at 79:23-81:9 [Wilson Testimony].

[33]    Transcript of Record Day 1 at 23:8-15 [Debtor Testimony]; Transcript of Record Day 2 at 10:14-11:17 [Lamb Testimony]; Transcript of Record Day 3 at 75:16-23 [Wilson Testimony].

[34]    Transcript of Record Day 3 at 148:7-149:1 [Christopher Testimony].

[35]    Transcript of Record Day 1 at 45:22-46:11 [Debtor Testimony]; Transcript of Record Day 2 at 23:22-24 [Lamb Testimony]; Transcript of Record Day 3 at 82:23-83:2 [Wilson Testimony]; Transcript of Record Day 3 at 176:22-24 [John Christopher ("Christopher") Testimony].

[36]    Transcript of Record Day 2 at 164:6-14 [Lamb Testimony].

[37]    LMS's Ex. 33; Transcript of Record Day 2 at 24:11-21 [Lamb Testimony]; Transcript of Record Day 3 at 83:9-14 [Wilson Testimony]; Transcript of Record Day 2 at 202:2-4 [Kimmel Testimony]; Transcript of Record Day 1 at 48:11-49:12 [Debtor Testimony].

and related construction services for Taco Bell restaurants totaling $1,033,122.68.[38]  Based on the sales and profit data presented by LMS, Taco Bell business generated approximately $499,952.10 in profit for LMS for 2016 and 2017.[39]

      23.    LMS received work orders from Taco Bell through the Google Domain emails and/or telephone calls, but LMS also had access to Taco Bell's online vendor portal ("Issue-Track") through which the status of work assignments and invoicing was tracked.[40]  Debtor and Kimmel, another LMS employee, used the same username and password for Issue-Track, though each could access Issue-Track on his/her respective computer.[41]

      24.    LMS also had dispatching software ("Win-Tec") that was housed on Debtor's LMS computer ("Debtor's Computer"), which LMS used for all customers.  Debtor initially shared the username and password for Debtor's Computer with Kimmel so that she could perform her work duties via Win-Tec on Debtor's Computer.  There was no password for Win-Tec.[42]

      25.    In or about January 2017, Debtor presented to Wilson documentation for the payment of bonus compensation to Debtor calculated at 5% of LMS's gross sales to Taco Bell

---

[38]     LMS's Ex. 30.

[39]     LMS's Ex. 30.

[40]     Transcript of Record Day 2 at 202:5-204:1, 230:8-20 [Kimmel Testimony].

[41]     Transcript of Record Day 2 at 204:2-19 [Kimmel Testimony].

[42]     Transcript of Record Day 1 at 43:19-45:21 [Debtor Testimony]; Transcript of Record Day 2 at 206:5-209:18 [Kimmel Testimony].

for the preceding week.[43]  Debtor did not ask Wilson to approve the commissions,[44] although Debtor asked Wilson on a weekly basis to include commissions in Debtor's paycheck.[45]  Debtor presented the information regarding the commissions calculation with such detail that Wilson believed that Lamb had approved paying commissions to Debtor.[46]

26.     Only Wilson or Lamb could have authorized paying the commissions to Debtor.[47] Wilson did not authorize any commissions.[48]  Lamb did not authorize any commissions.[49] Wilson made no effort to confirm with Lamb whether Lamb had approved the commissions.[50] There is no evidence to suggest that the "bonus compensation" section of the Employment Agreement was modified to provide for the commissions.[51]

27.     There was no reasonable basis for Debtor to believe that he had a legitimate claim to commissions.

28.     Between January and September 2017, LMS paid Debtor a total of $39,034.02 in

---

[43]     LMS's Exs. 4 and 14; Transcript of Record Day 3 at 86:6-21 [Wilson Testimony]; Transcript of Record Day 1 at 49:13-57:14 [Debtor Testimony].  Debtor testified that he had a meeting with Lamb and Wilson at which either Lamb or Wilson set the bonus compensation rate at 5% of gross sales to Taco Bell to be paid weekly. Transcript of Record Day 1 at 49:13-54:10 [Debtor Testimony].  Lamb denied ever having agreed to such bonus compensation.  Transcript of Record Day 2 at 31:2-4 [Lamb Testimony].  Wilson denied ever having approved bonus compensation.  Transcript of Record Day 3 at 86:22-87:9 [Wilson Testimony].  The Court finds Debtor's testimony about an agreement for the payment of bonus compensation not credible.

[44]     Transcript of Record Day 3 at 86:22-87:9 [Wilson Testimony].

[45]     Transcript of Record Day 3 at 86:6-89:5 [Wilson Testimony]; LMS's Ex. 14.

[46]     Transcript of Record Day 3 at 86:22-87:9, 116:25-117:10 [Wilson Testimony].

[47]     Transcript of Record Day 3 at 87:1-3 [Wilson Testimony].

[48]     Transcript of Record Day 3 at 87:1-9 [Wilson Testimony].

[49]     Transcript of Record Day 2 at 31:2-4 [Lamb Testimony].

[50]     Transcript of Record Day 3 at 117:11-16 [Wilson Testimony].

[51]     LMS's Ex. 3, ¶ 24.

commissions.[52]

29.    Lamb became aware of the commissions paid to Debtor in early fall of 2017 when LMS's CPA alerted him; Lamb immediately stopped the payment of commissions to Debtor around September 2017.[53]

30.    LMS had an unwritten "moonlighting" policy regarding performing residential HVAC Services outside the scope of LMS employment ("Outside Work"), which allowed employees to do Outside Work for family or friends outside their scope of work for LMS so long as they had permission from Lamb.[54]  Lamb advised Debtor that his job responsibilities as Service Manager included ensuring that his employees were not engaging in unauthorized Outside Work.[55]

31.    Debtor performed Outside Work during his LMS employment without authorization from LMS, in direct contradiction of LMS's unwritten moonlighting policy.[56]

    a.    In or about early October 2017, Lamb discovered a residential trailer HVAC unit in LMS's trash area.[57]

        i.    LMS's credit card showed an equipment charge of $1,777.14 by

---

[52]    LMS's Ex. 4.

[53]    Transcript of Record Day 2 at 28:1-31:7 [Lamb Testimony].

[54]    Transcript of Record Day 2 at 21:1-22:6, 128:23-129:5 [Lamb Testimony]; Transcript of Record Day 3 at 98:14-99:7 [Wilson Testimony]; Transcript of Record Day 3 at 12:13-14:7 [Wunderlich Testimony].

[55]    Transcript of Record Day 2 at 21:1-22:6 [Lamb Testimony].

[56]    LMS's Ex. 3, ¶ 2; Debtor's Ex. A, ¶ 2.  Transcript of Record Day 2 at 32:5-36:25 [Lamb Testimony]; Transcript of Record Day 3 at 99:5-102:1 [Wilson Testimony]; Transcript of Record Day 1 at 59:1-65:4 [Debtor Testimony]; Transcript of Record Day 3 at 12:13-23:5 [Wunderlich Testimony].  Debtor testified that he had verbal permission to complete Outside Work.  Transcript of Record Day 1 at 59:11-13 [Debtor Testimony].  The Court does not find Debtor's testimony persuasive.

[57]    Transcript of Record Day 2 at 32:5-24 [Lamb Testimony].

R.E. Michel (the "R.E. Michel Credit Charge").[58]

      ii.    Debtor had two employees purchase equipment using the LMS credit card (the R.E. Michel Credit Charge) and, using LMS trucks, had the employees meet Debtor to install the equipment at a mobile home residence in Greenfield, Indiana.[59] The installation constituted Outside Work.

      iii.    Debtor did not have authority to use the LMS credit card to purchase equipment for Outside Work.[60] There is no evidence to suggest that Debtor reasonably believed he was authorized to use the LMS credit card for purchases related to Outside Work (authorized or unauthorized).

      iv.    Debtor did not reimburse LMS for the R.E. Michel Credit Charge.[61]

      b.    Following October 20, 2017, LMS discovered an invoice showing that Debtor performed additional Outside Work for Terrance Watkinson with respect to a thermostat in a residential setting, with a charge of $625 for six hours of services plus material provided (the

---

[58]    LMS's Ex. 15; Transcript of Record Day 2 at 32:5-35:2 [Lamb Testimony]; Transcript of Record Day 3 at 99:8-102:1 [Wilson Testimony].

[59]    LMS's Ex. 15; Transcript of Record Day 3 at 12:13-17:20 [Wunderlich Testimony]; Transcript of Record Day 3 at 99:5-102:1 [Wilson Testimony].

[60]    Transcript of Record Day 2 at 33:11-36:19 [Lamb Testimony].

[61]    Transcript of Record Day 2 at 36:3-19 [Lamb Testimony]; Transcript of Record Day 4 at 82:22-25 [Lamb Testimony]; Transcript of Record Day 3 at 98:3-13 [Wilson Testimony]. Debtor testified that he had verbal permission to complete Outside Work. Transcript of Record Day 1 at 59:11-13 [Debtor Testimony]. Debtor testified that he reimbursed LMS at LMS's office for the material and equipment used for Outside Work. Transcript of Record Day 1 at 68:19-71:12 [Debtor Testimony]. The Court does not find Debtor's testimony credible. Debtor's wife, Ashley Mattson, testified that Debtor kept money from Outside Work on the counter in their kitchen and that she saw Debtor give money in an unknown amount for an unspecified job to Wilson at a casino in Shelbyville, Indiana on the first Saturday of May, 2017. Transcript of Record Day 3 at 231:18-238:13 [Ashley Mattson Testimony]. The Court finds that Mrs. Mattson's testimony does not corroborate Debtor's testimony with respect to Debtor's reimbursing LMS related to the R.E. Michel Credit Charge. The alleged "reimbursement" Mrs. Mattson witnessed occurred in May 2017, but the R.E. Michel Credit Charge did not occur until October 2017.

"Terrance Outside Work").[62]

    i.  Debtor and Wunderlich performed the Terrance Outside Work[63] with Debtor designating Wunderlich's time as "shop time", meaning time spent by LMS employees during working hours that was not specifically allocable to any particular LMS job.[64]

    ii.  Wunderlich made $30/hour at LMS at that time,[65] and was paid by LMS for the time he spent on the Terrance Outside Work that was recorded as "shop time".[66] There is no evidence with respect to the actual number of hours of "shop time" spent by Wunderlich on the Terrance Outside Work – the Terrance Outside Work invoice suggests the job took six hours, but there is no evidence with regard to what portion of that time was spent by Wunderlich or whether "shop time" included hours that were not reflected on the invoice. Likewise, there is no evidence with regard to the cost to LMS of Debtor's completing the Terrance Outside Work on company time. There is no evidence that Debtor compensated LMS for the salary/wages LMS paid to Debtor and Wunderlich for the time they spent on the Terrance Outside Work.[67]

    iii.  There is no evidence that the "material" referenced in the invoice for the Terrance Outside Work was purchased using LMS funds.

---

[62]  LMS's Ex. 16; Transcript of Record Day 2 at 45:8-46:17 [Lamb Testimony]; Transcript of Record Day 4 at 83:1-4 [Lamb Testimony]; Transcript of Record Day 3 at 14:10-15:1 [Wunderlich Testimony].

[63]  Transcript of Record Day 3 at 14:8-15:1 [Wunderlich Testimony].

[64]  LMS's Ex. 17; Transcript of Record Day 1 at 60:11-63:25 [Debtor Testimony]; Transcript of Record Day 3 at 20:4-22 [Wunderlich Testimony].

[65]  Transcript of Record Day 3 at 59:21-60:16 [Wunderlich Testimony].

[66]  Transcript of Record Day 3 at 21:10-23:5 [Wunderlich Testimony].

[67]  Transcript of Record Day 4 at 83:1-4 [Lamb Testimony]; Transcript of Record Day 3 at 98:11-13 [Wilson Testimony].

32.     In or around September 2017, Debtor began soliciting LMS employees, namely Matt Low, Wunderlich, Kimmel and possibly Sam Evans and Matt Sayman, to work with Debtor's new company "Mattson Mechanical".  No employees of LMS left LMS for Mattson Mechanical.[68]

33.     Effective October 16, 2017, Debtor organized "Mattson Mechanical LLC" with the Indiana Secretary of State.[69]

34.     On October 20, 2017, LMS issued to Debtor a termination letter dated October 18, 2017, which stated LMS terminated Debtor for using LMS's "equipment, labor and purchasing ability…to perform [Outside Work], at your direction, in an unauthorized manner and for which [LMS] was not compensated."[70]  Debtor was unable and/or unauthorized to access Debtor's Computer following the issuance of the termination letter and was escorted out of the LMS building.[71]

35.     After Debtor's termination, LMS began receiving less work from Taco Bell.[72] After earning $940,862 for service work performed for Taco Bell in 2017, LMS's total sales for Taco Bell dropped to $394,144 in 2018, then to $393,875 in 2019, and to $18,058 for the first

---

[68]     Transcript of Record Day 2 at 212:25-214:15 [Kimmel Testimony]; Transcript of Record Day 3 at 29:5-30:14, 32:17-24 [Wunderlich Testimony]; Transcript of Record Day 1 at 73:11-76:16 [Debtor Testimony].  Debtor testified that Wunderlich, Kimmel and Matt Low agreed to leave with Debtor.  If true, the Court discounts that testimony as none of them left LMS to work at Mattson Mechanical.

[69]     LMS's Ex. 10A.

[70]     LMS's Ex. 5; Transcript of Record Day 2 at 212:16-18 [Kimmel Testimony].

[71]     Transcript of Record Day 2 at 166:11-167:14 [Lamb Testimony].

[72]     Transcript of Record Day 2 at 39:25-40:6 [Lamb Testimony]; Transcript of Record Day 3 at 105:18-106:9 [Wilson Testimony].  Wunderlich testified that there was no Taco Bell work for roughly six months.  Transcript of Record Day 3 at 51:16-21 [Wunderlich Testimony].  Wilson testified that there was no Taco Bell work from the time Debtor was terminated until at least when Lamb and Wilson met with Kriese (as defined below) in November or December of 2017.  Transcript of Record Day 3 at 106:25-108:10 [Wilson Testimony].

quarter of calendar year 2020.[73] The relationship between Taco Bell and LMS was "at will", and Taco Bell could have stopped buying LMS's HVAC Services at any time for any reason.[74] From time to time after his termination, Debtor received calls for service from Taco Bell stores, which he referred to LMS.[75] The additional trucks and equipment LMS acquired to service the Taco Bell business were not used at their full capacity following the decrease in business LMS received from Taco Bell.[76]

36.     Multiple reasons were given for the decrease in business LMS received from Taco Bell after Debtor's termination.

a.     *Performance Issues*:  Christopher, a former employee of Taco Bell, was the only person affiliated with Taco Bell to testify.  He testified that LMS's quality of work was "the biggest problem" leading to a reduction of Taco Bell orders to LMS and that there were billing issues and issues with LMS responding in a timely manner that were not acceptable.[77]

b.     *Taco Bell's desire to remain neutral in the dispute between LMS and Debtor*:  Lamb testified that Drew Kriese ("Kriese"), an employee of Taco Bell, told him that "Taco Bell doesn't want to get in the middle of this mess"[78] and that "he [Kriese] was not going

---

[73]     LMS's Ex. 30.

[74]     Transcript of Record Day 2 at 164:6-14 [Lamb Testimony].

[75]     Transcript of Record Day 1 at 203:15-205:3 [Debtor Testimony].

[76]     Transcript of Record Day 2 at 75:25-80:4 [Lamb Testimony]; Transcript of Record Day 3 at 114:9-25 [Wilson Testimony].

[77]     Transcript of Record Day 3 at 160:9-161:4, 170:10-23, 172:16-174:13, 196:23-200:18, 222:16-223:4 [Christopher Testimony].  Debtor called this "bad business management".  Transcript of Record Day 1 at 209:15-21 [Debtor Testimony].  Lamb testified that he has never been advised by Taco Bell of any quality, pricing, callback rate, customer complaint, or LMS employee attitude or appearance issues that led Taco Bell to lower or stop giving work to LMS.  Transcript of Record Day 4 at 84:7-85:1 [Lamb Testimony].

[78]     Transcript of Record Day 4 at 83:23-84:6 [Lamb Testimony].

to get involved with all that's going on between Mattson and Lamb Mechanical".[79]  Christopher testified that both Kriese and Annette Nyehart ("Nyehart"), a vice president with Taco Bell, told him that they did not want to get in the middle of the issues between LMS and Debtor.[80]

          c.    *Debtor's actions*:

               i.    Debtor told Taco Bell that LMS was going out of business and changing its name to Mattson Mechanical.[81]  Kriese relayed his understanding to Lamb that LMS was "going out of business", which Lamb immediately denied to Kriese.[82]

               ii.    Debtor communicated with Taco Bell representatives after his termination, including to recruit Taco Bell business away from LMS.[83]

               iii.    Debtor locked the Google Doman email accounts which interfered with LMS's ability to track, dispatch and invoice Taco Bell work.[84]

      37.    LMS wanted to, and worked to, retain Taco Bell's business after Debtor's termination.

          a.    On the day of Debtor's termination, Lamb contacted Kriese by telephone to advise of Debtor's separation from LMS.[85]

          b.    Three days after Debtor's termination, Lamb talked with Joe Fouse, a

---

[79]    Transcript of Record Day 2 at 41:22-42:20, 73:4-8 [Lamb Testimony].

[80]    Transcript of Record Day 3 at 196:1-12, 226:23-227:4 [Christopher Testimony].

[81]    LMS's Ex. 21; Transcript of Record Day 1 at 79:24-83:16 [Debtor Testimony]; Transcript of Record Day 2 at 37:1-38:8 [Lamb Testimony].

[82]    Transcript of Record Day 4 at 82:15-84:4 [Lamb Testimony].

[83]    Transcript of Record Day 1 at 67:19-68:10, 78:15-83:16, 106:5-17 [Debtor Testimony].

[84]    Transcript of Record Day 3 at 106:13-24, 122:13-124:14 [Wilson Testimony].

[85]    Transcript of Record Day 4 at 82:15-84:4 [Lamb Testimony].

representative of Taco Bell, by telephone and met with him in person the day following the telephone call to continue the installation by LMS of bins that were in LMS's shop at the time of Debtor's termination.  LMS continued to install the bins as well as fryers, freezers and hoods.[86]

      c.    Lamb and Wilson tried to meet with Taco Bell district managers, and Lamb and Wilson met with Kriese in November or December of 2018.[87]

      d.    Six or seven months after Debtor was terminated, or perhaps as late as July or August of 2018, Lamb, Wilson and Wunderlich attended a meeting called by Taco Bell, along with other vendors for Taco Bell.[88]  Lamb *et al.* met privately with Nyehart of Taco Bell regarding future business that Taco Bell might award to LMS.[89]

Following Debtor's termination, LMS continued to work for Taco Bell for a period of time.[90]

38.    Following Debtor's termination, Wunderlich was promoted to Service Manager. Wunderlich does not hold a college degree.[91]  Wunderlich's current salary is approximately $89,000/year.[92]

---

[86]    Transcript of Record Day 2 at 56:3-61:1 [Lamb Testimony].  Lamb distinguishes such installations (1) as being "construction work"; and (2) as assigned by an entity other than Taco Bell, but the fact remains that LMS continued to work for Taco Bell after Debtor's termination.

[87]    Transcript of Record Day 3 at 106:25-109:3, 128:8-18 [Wilson Testimony].  Lamb testified that he never met with Kriese.  Transcript of Record Day 2 at 40:7-11 [Lamb Testimony].

[88]    Transcript of Record Day 3 at 60:22-64:8, 70:16-72:19 [Wunderlich Testimony]; Transcript of Record Day 3 at 153:3-155:5, 206:24-207:19 [Christopher Testimony]; Transcript of Record Day 2 at 97:4-107:2 [Lamb Testimony].

[89]    Transcript of Record Day 3 at 60:22-63:15 [Wunderlich Testimony].

[90]    Transcript of Record Day 2 at 56:3-61:1, 68:3-9, 68:17-69:7 [Lamb Testimony]; Transcript of Record Day 3 at 42:22-43:13 [Wunderlich Testimony]; Transcript of Record Day 3 at 116:5-10, 138:5-139:4 [Wilson Testimony]; Transcript of Record Day 3 at 150:14-151:5, 156:15-17, 196:23-198:3, 199:4-200:5, 204:6-206:16, 222:16-224:9 [Christopher Testimony]; Transcript of Record Day 3 at 253:18-254:14 [Matt Low Testimony].

[91]    Transcript of Record Day 2 at 137:13-16 [Lamb Testimony]; Transcript of Record Day 3 at 7:22-8:1, 43:16-18 [Wunderlich Testimony].

[92]    Transcript of Record Day 3 at 52:25-53:1 [Wunderlich Testimony].

39.     Following Debtor's termination, Kimmel could not access Issue-Track (Taco Bell's online vendor portal) because LMS's access was "locked out".[93]  In such instances, any vendor including LMS could contact Taco Bell, and Taco Bell would reset the password and send a temporary password to such vendor, which such vendor could then change.[94]  Kimmel contacted Taco Bell a week or two after Debtor's termination (because she had prioritized other work responsibilities as more important than re-gaining access to Issue-Track), and LMS's access to Issue-Track was restored.[95]

40.     Following Debtor's termination, Kimmel attempted to log in to Debtor's Computer in order to access Win-Tec (LMS's dispatching software) but was unable to log into Debtor's Computer.[96]  Although Kimmel could not use Win-Tec to dispatch, she was able to dispatch using a telephone to connect with LMS employees and customers.[97]  Two days after Debtor's termination, Kimmel, at the instruction of Lamb, called a telephone number associated with Win-Tec to gain access to Win-Tec.[98]  To gain access to Debtor's Computer, LMS took it to "The Computer Guy" five days after Debtor's termination, and The Computer Guy was able to access Debtor's Computer and the files on it.[99]

---

[93]     Transcript of Record Day 2 at 216:16-217:5 [Kimmel Testimony].  Being locked out of Issue-Track was an issue prior to Debtor's termination as well.  Transcript of Record Day 2 at 218:24-220:23 [Kimmel Testimony]; Transcript of Record Day 1 at 94:11-96:6 [Debtor Testimony]; LMS's Exs. 17 and 20.

[94]     Transcript of Record Day 2 at 217:6-22 [Kimmel Testimony]; Transcript of Record Day 3 at 161:23-162:14 [Christopher Testimony]; Transcript of Record Day 1 at 190:20-193:17 [Debtor Testimony]; LMS's Ex. 20.

[95]     Transcript of Record Day 2 at 216:16-222:17 [Kimmel Testimony].

[96]     Transcript of Record Day 2 at 215:2-6 [Kimmel Testimony]; Transcript of Record Day 4 at 11:13-12:22 [Kimmel Testimony]; Transcript of Record Day 2 at 44:25-45:2 [Lamb Testimony].

[97]     Transcript of Record Day 2 at 215:7-13, 232:19-233:11 [Kimmel Testimony].

[98]     Transcript of Record Day 2 at 220:24-221:14 [Kimmel Testimony].

[99]     Transcript of Record Day 2 at 44:4-8, 45:3-48:8, 169:15-170:2 [Lamb Testimony]; LMS's Ex. 29.

41.     Following Debtor's termination, LMS could not access the Google Domain (the "@lambmechanicalservices.com" email suite).[100]  LMS did not regain access to the Google Domain email suite for approximately one year, and when it did the "emails were empty".[101]  When LMS regained access to the Google Domain emails, LMS learned that the last date on which the password was changed was October 20, 2017, the date of Debtor's termination, but the time the password was changed is unknown.[102]  Only Debtor, not Kimmel, Lamb or Wilson, consistently and primarily used the Google Domain email.[103]

42.     Following his termination from LMS, Debtor worked for Complete Comfort for a short time.[104]  While at Complete Comfort, Debtor attempted to get work for Complete Comfort with Taco Bell.[105]  There is no evidence that Complete Comfort did any work for Taco Bell.[106]

43.     On November 22, 2017, Debtor was offered the position of Director of Key Accounts with Gordon Plumbing ("Gordon"), which Debtor accepted.[107]  While at Gordon, Debtor communicated with Kriese and Christopher, including about generating work for Gordon

---

[100]     Transcript of Record Day 2 at 223:8-225:9 [Kimmel Testimony]; Transcript of Record Day 3 at 106:10-21 [Wilson Testimony]; Transcript of Record Day 2 at 43:13-21 [Lamb Testimony].

[101]     Transcript of Record Day 3 at 109:4-114:7 [Wilson Testimony]; LMS's Ex. 25.

[102]     Transcript of Record Day 3 at 122:24-124:14 [Wilson Testimony].

[103]     Transcript of Record Day 2 at 234:18-236:1 [Kimmel Testimony]; Transcript of Record Day 3 at 79:23-81:14 [Wilson Testimony]; Transcript of Record Day 2 at 43:13-44:24 [Lamb Testimony].

[104]     Transcript of Record Day 1 at 106:5-7 [Debtor Testimony].

[105]     LMS's Ex. 22; Transcript of Record Day 1 at 106:15-108:1 [Debtor Testimony].

[106]     Transcript of Record Day 3 at 159:17-23 [Christopher Testimony]; Transcript of Record Day 1 at 194:5-12 [Debtor Testimony].

[107]     LMS's Ex. 6; Transcript of Record Day 1 at 108:2-20 [Debtor Testimony].

with Taco Bell.[108]  There is no evidence that Gordon did any work for Taco Bell.[109]

44.    On or about February 14, 2018, TPC Mechanical Contractors, LLC ("TPC")

offered Debtor employment as its Director of HVAC Service Operations, which Debtor

accepted.[110]  TPC is a local competitor of LMS.[111]  An *Agreed Injunction* was entered by the

Marion Superior Court on August 16, 2018 in the cause captioned *Mattson v. Lamb Mechanical*

*Services LLC*, Cause No. 49D14-1712-CT-046860, whereby, among other things, Debtor was

prohibited from engaging in certain activities relating to Taco Bell, including without limitation

soliciting business from Taco Bell and interfering with Taco Bell's relationship with LMS.[112]

There is no evidence that TPC did any work for Taco Bell.[113]

45.    Based on all the evidence presented at the Trial, the Court finds:

a.    Taco Bell was a "relationship" client of Debtor's, and their relationship

pre-existed LMS's performing work for Taco Bell.[114]  Debtor caused substantial business to

migrate to LMS because of his positive relationship with Taco Bell employees.  It is unsurprising

that LMS did not acquire substantial business it might have enjoyed had Debtor continued to be

employed by LMS.

b.    The primary reason LMS hired Debtor was because Debtor promised to

---

[108]    LMS's Exs. 23, 24 and excerpts of Exs. 27, 27B, 27C and 27F; Transcript of Record Day 1 at 110:7-131:20 [Debtor Testimony].

[109]    Transcript of Record Day 3 at 159:17-23 [Christopher Testimony]; Transcript of Record Day 1 at 194:5-12 [Debtor Testimony].

[110]    LMS's Ex. 8; Transcript of Record Day 1 at 140:16-141:1 [Debtor Testimony].

[111]    Transcript of Record Day 2 at 94:3-14 [Lamb Testimony].

[112]    LMS's Ex. 9B.

[113]    Transcript of Record Day 3 at 159:17-23 [Christopher Testimony]; Transcript of Record Day 1 at 194:5-12 [Debtor Testimony].

[114]    *See, e.g.,* Transcript of Record Day 1 at 23:5-15, 130:10-131:4 [Debtor Testimony].

bring Taco Bell business to LMS.[115]

      c.    The primary reason LMS paid Debtor a salary of $85,000 was because that was the salary requested by Debtor, it was within the market range for such position and Debtor was likely to bring the Taco Bell business to LMS.[116]

      d.    Debtor took affirmative action to obtain commissions when he could not have reasonably believed that he had a legitimate contractual claim for commissions.

      e.    Debtor could not have reasonably believed that he could use the LMS credit card to purchase equipment or materials for Outside Work.

    46.    LMS seeks the following damages:[117]

      a.    excessive salary ($45,000) and benefits ($6,550) for Debtor's true experience level;

      b.    unauthorized "bonus" commissions ($39,034 principal);

      c.    unauthorized Outside Work consisting of the Terrance Outside Work and the R.E. Michel Credit Charge ($2,402 principal);

      d.    lost profits due to the stoppage of work by Taco Bell ($221,461 principal consisting of $90,832 for 2018, $106,022 for 2019, and $24,607 for the first quarter of 2020, applying the average profit margin of 2018-2019 to that quarter);

      e.    idle trucks and equipment due to the stoppage of work by Taco Bell ($82,500 principal);

      f.    litigation costs of $1,401 before the date of Trial;

      g.    attorney fees; and

---

[115]    *See, e.g.,* Transcript of Record Day 2 at 10:14-22, 146:20-25, 181:19-21, 190:22-191:6 [Lamb Testimony].

[116]    *See, e.g.,* Transcript of Record Day 2 at 13:18-14:14, 190:22-191:6 [Lamb Testimony].

[117]    LMS's Ex. 38.

h.      all available prejudgment interest, treble damages, and fees and costs

through the end of Trial.

## Conclusions of Law

A.      Any finding of fact above will also be a conclusion of law, and any conclusion of

law will also be a finding of fact, to support the judgment of the Court.

B.      This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 157 and 1334.

C.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2)(I).

D.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

***Exceptions to Discharge***

E.      Exceptions to discharge under § 523 "are to be construed strictly against a

creditor and liberally in favor of the debtor." *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir.

1985). "The burden is on the objecting creditor to prove exceptions to discharge." *Goldberg*

*Securities, Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992) (citation

omitted). The burden of proof required is a preponderance of the evidence. *Grogan v. Garner*,

498 U.S. 279, 291, 111 S.Ct. 654, 661 (1991).

*§ 523(a)(2)(A)*

F.      Section 523(a) provides, in relevant part:

A discharge under section 727 … of this title does not discharge an
individual debtor from any debt –

(2)      for money, property, services, or an extension, renewal, or
refinancing of credit, to the extent obtained by –
        (A)      false pretenses, a false representation, or actual
        fraud, other than a statement respecting the debtor's or an
        insider's financial condition;

G.     The Seventh Circuit Court of Appeals distinguishes material differences among the three possible grounds for nondischargeability under § 523(a)(2)(A) and has formulated two different tests, one for both "false pretenses" and "false representation" and another for "actual fraud." *See Rae v. Scarpello (In re Scarpello)*, 272 B.R. 691, 699-700 (Bankr. N.D. Ill. 2002) (citing *McClellan v. Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000)).

H.     To prevail on a nondischargeability claim under the "false pretenses" or "false representation" theory, a creditor must prove all of the following elements: "(1) the debtor made a false representation or omission, (2) that the debtor (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3) upon which the creditor justifiably relied." *Ojeda v. Goldberg*, 599 F.3d 712, 716-17 (7th Cir. 2010).

I.     "What constitutes 'false pretenses' in the context of § 523(a)(2)(A) has been defined as 'implied misrepresentations or conduct intended to create and foster a false impression.' " *Mem'l Hosp. v. Sarama (In re Sarama)*, 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996) (quoting *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 959 (Bankr. N.D. Ill. 1995) (quotations omitted)). "False pretenses do not necessarily require overt misrepresentations. Instead, omissions or a failure to disclose on the part of the debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor." *Id.* at 928 (citation omitted).

J.     A "false representation" is an express misrepresentation that can be shown by the debtor's written statement, spoken statement or conduct. *Deady v. Hanson (In re Hanson),* 432 B.R. 758, 772 (Bankr. N.D. Ill. 2010) (citing *Bletnitsky v. Jairath (In re Jairath)*, 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001)). "A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression." *Id.* (citing *Trizna & Lepri v. Malcolm*

*(In re Malcolm),* 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992)).  "An intentional falsehood relied on under § 523(a)(2)(A) must concern a material fact." *Scarpello*, 272 B.R. at 700 (citing *Jairath*, 259 B.R. at 314).

K.    Justifiable reliance is an intermediate level of reliance which is less stringent than "reasonable reliance" but more stringent than "reliance in fact." *See Field v. Mans*, 516 U.S. 59, 72-73, 116 S.Ct. 437, 445, 133 L.Ed.2d 351 (1995).  Justifiable reliance requires only that the creditor did not "blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation" and imposes no duty on the creditor to investigate unless the falsity of the representation is readily apparent. *Id.* at 71 (quotations omitted).  Justifiable reliance is not measured from the objective person standard, but rather from the experiences and characteristics of the particular creditor. *Id.* (quotation omitted).

L.    "Scienter, or intent to deceive, is … a required element under § 523(a)(2)(A) whether the claim is for a false representation, false pretenses, or actual fraud." *Gasunas v. Yotis (In re Yotis)*, 548 B.R. 485, 495 (Bankr. N.D. Ill. 2016) (citation omitted).

M.    A debtor's intent to deceive for purposes of the false pretenses and false representation prongs on § 523(a)(2)(A) "is measured by a debtor's subjective intention at the time the representation was made." *Scarpello*, 272 B.R. at 700 (citing *Mercantile Bank v. Canovas*, 237 B.R. 423, 428 (Bankr. N.D. Ill. 1998)).  "Because direct proof of fraudulent intent is often unavailable, fraudulent intent may be inferred from the surrounding circumstances." *Hanson*, 432 B.R. at 773 (internal citations omitted).

N.    "[A]ctual fraud is broader than misrepresentation", *McClellan*, 217 F.3d at 893, in that neither a debtor's misrepresentation nor a creditor's reliance is necessary to prove nondischargeability for "actual fraud." *Scarpello*, 272 B.R. at 700 (citing *McClellan*, 217 F.3d at

894).  "Actual fraud" is defined as "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another" which includes "all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated."  *McClellan*, 217 F.3d at 893 (quotations omitted).  *See also Husky Int'l Elec., Inc. v. Ritz*, -- U.S. --, 136 S.Ct. 1581, 1586, 194 L.Ed.2d 655 (2016) ("The word 'actual' has a simple meaning in the context of common-law fraud:  It denotes any fraud that 'involv[es] moral turpitude or intentional wrong.'") (quotation omitted).  In such cases, a creditor must prove "(1) a fraud occurred; (2) the debtor intended to defraud the creditor; and (3) the fraud created the debt that is the subject of the discharge dispute."  *Hanson*, 432 B.R. at 772 (citing *McClellan*, 217 F.3d at 894).

O.      "[T]he focus of an 'actual fraud' claim is on the defendant's state of mind at the time of his purportedly fraudulent conduct."  *Merritt v. Wiszniewski (In re Wiszniewski)*, 2010 WL 3488960 at *5 (Bankr. N.D. Ill. 2010) (citation omitted).

*Service Manager Position, Job Application, College Degree, License and Business Purchase Agreement*

P.      LMS alleged that Debtor received salary and benefits from LMS that he would not have received but for the false statements Debtor made during the employment application process and the fake Business Purchase Agreement (*see* Finding of Fact ¶ 46(a)).

1.      There is no question that Debtor lied regarding:

a.      Earning a college degree, but a college degree was not required for the Service Manager position.  Also, LMS replaced Debtor with an employee who does not hold a college degree.

b.      Holding a license, but the Service Manager was not required to hold a license.  LMS was operating without Debtor's purported license, and Debtor was not required to make it available to LMS during the term of his employment with LMS.

c.     Selling his former business to Mr. Quik, but the evidence was unclear as to when Debtor made representations about the sale of his former business and gave LMS the fake Business Purchase Agreement.  LMS learned about the fake sale as part of the employment process, but LMS did not prove that LMS learned about and relied on the fake sale when making its employment decisions.

2.     LMS has not sustained its burden to prove that these lies concerned material facts, that LMS justifiably relied on such lies or that Debtor had the intent required under § 523(a)(2)(A).  Moreover, LMS has not proven that any of Debtor's lies were a proximate cause of any monetary damages suffered by LMS.

3.     Rather, the evidence leads the Court to conclude that the primary reason LMS hired Debtor was because Debtor had a very positive relationship with employees of Taco Bell and was likely to bring substantial Taco Bell business to LMS.  The primary reason LMS paid Debtor $85,000/year was because that was the salary requested by Debtor, such salary was within the market range for such position and Debtor was likely to bring Taco Bell business to LMS.  According to LMS's data, Taco Bell generated profits for LMS in 2016 and 2017 that far exceeded the amount of Debtor's salary and benefits, so it cannot be concluded that LMS was damaged by Debtor's lies.

4.     Without evidence to causally link Debtor's lies to the elements of § 523(a)(2)(A) and to show a causal link to any monetary damages, LMS has not proven the required elements to support a judgment of nondischargeability related to Debtor's salary and benefits.

*Commissions*

Q.     LMS alleged that Debtor received unauthorized commissions by virtue of false representation(s) or false pretenses (*see* Finding of Fact ¶ 46(b)).

1.      The terms of the Employment Agreement required that, to be binding, any modification or amendment of the Employment Agreement had to be in writing and signed by LMS and Debtor.  There is no evidence that the "bonus compensation" section of the Employment Agreement was modified to provide for commissions.

2.      Based on the evidence (including the Court's conclusion regarding witness credibility), the Court concludes that Debtor made a conscious choice to approach Wilson, not Lamb, and to trick him into adding "commissions" to Debtor's pay, a choice that went beyond the fact that Wilson processed payroll.  Debtor's subjective intention was to get commissions by presenting his calculation to Wilson informally in order to deceive Wilson into believing that Lamb had approved the requested "commissions" and to avoid having Lamb deny Debtor's request.

a.      When commissions were initially discussed during the employment process, Lamb refused to commit.  When the Employment Agreement was negotiated, with both parties having counsel, the "bonus compensation" section was left substantially blank.  Rather than pursue an amendment of the Employment Agreement, which would have involved Lamb and was necessary for LMS's obligation to pay the bonus compensation to be binding, Debtor chose to go around Lamb and to Wilson.

b.      Debtor did not ask Wilson to approve the commissions.  Rather, Debtor presented the bonus calculation in such a way as to lead Wilson to believe Lamb had already approved it.[118]  Wilson knew that only he or Lamb could approve the commissions, and Wilson knew that Wilson had not.  The falsity of Debtor's presentation was not readily apparent to Wilson – less than three months after Debtor started working for LMS, Wilson had no reason

---

[118]      There is no evidence that Debtor expressly told Wilson that Lamb approved the commissions, so the Court concludes that Debtor did not make a false representation.

to disbelieve what Debtor was telling him.

              c.    On the other hand, Debtor knew Lamb had not approved Debtor's being paid commissions.  Rather than asking Wilson to approve the commissions, Debtor intended to deceive Wilson into believing that Lamb had approved payment of the requested commissions, and that is exactly what Wilson believed.  Debtor got the result he intended by giving Wilson the false impression that Lamb had approved the commissions – he received commissions without having to get Lamb's approval – even though Debtor had no reasonable basis to believe he had a legitimate contractual claim to commissions and that Lamb would approve their payment.

              3.    Based on the weight of evidence regarding the totality of material circumstances, the Court concludes that LMS has met its burden of proof to show that Debtor obtained commissions through false pretenses and therefore is entitled to a judgment of nondischargeability for damages related to Debtor's commissions.

*§ 523(a)(4)*

        R.    A debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" may be excepted from discharge pursuant to § 523(a)(4).

        S.    In the Complaint, LMS generally alleged that "[a]ll or part of the debt owed to LMS is non-dischargeable as it is a debt for fraud or defalcation while acting in a fiduciary capacity (i.e., a managerial-level employee owing at least a duty of loyalty), embezzlement, or larceny within the meaning of Bankruptcy Code § 523(a)(4)."  Complaint, ¶ 34.  In LMS's proposed findings of fact and conclusions of law, which the Court treats as LMS's post-Trial brief, LMS limited its arguments solely to the "fraud or defalcation while acting in a fiduciary capacity" prong of § 523(a)(4).  On this record, the Court concludes that LMS has abandoned the embezzlement and larceny prongs of § 523(a)(4).  *See United States v. Livecchi*, 605 F.Supp.2d

437, 451 (W.D.N.Y. 2009).

T.      "The court has defined a fiduciary relationship under § 523(a)(4) as 'a difference in knowledge or power between fiduciary and principal which … gives the former a position of ascendancy over the latter.' … A fiduciary relation only qualifies under § 523(a)(4) if it 'imposes real duties in advance of the breach.' " *In re Frain*, 230 F.3d 1014, 1017 (7th Cir. 2000) (citations omitted).

<u>Unauthorized Outside Work and Commissions</u>

U.      LMS alleged that Debtor served in a fiduciary capacity while employed by LMS and that LMS was harmed by Debtor's defalcating LMS's funds through Debtor's unauthorized Outside Work (*see* Finding of Fact ¶ 46(c)) and Debtor's obtaining unauthorized commissions (*see* Finding of Fact ¶ 46(b)).

1.      At no point during his employment with LMS was Debtor an officer, director, owner, member or manager of LMS.  Although Debtor may have given himself the title of "Vice President of Operations", Debtor had no duties or any additional obligations imposed by LMS and still retained the work/level of obligation as Service Manager.

2.      LMS has not sustained its burden to prove that the relationship between LMS and Debtor was a fiduciary relationship.

a.      Debtor did not occupy a position or ascendancy in knowledge or power over LMS.  Lamb was heavily involved in the operations of LMS after Debtor was hired and maintained a position of power over Debtor.  Though Debtor knew more about the Taco Bell business at the beginning of his tenure with LMS (which is understandable given that Taco Bell was a "relationship" client of Debtor's), LMS staff, including Lamb, Kimmel, Wunderlich and others, grew in their knowledge of and/or interaction with Issue-Track, Taco Bell staff, etc. in the discharge of the Taco Bell work.

           b.      The relationship imposed "no real duties" on Debtor beyond the requirement that he discharge his work responsibilities as Service Manager.

        3.      Because Debtor was not in a fiduciary relationship with LMS, the Court concludes that LMS is not entitled to a judgment of nondischargeability for damages pursuant to § 523(a)(4).

*§ 523(a)(6)*

V.      A debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" may be excepted from discharge pursuant to § 523(a)(6). "Bankruptcy courts in [the Seventh Circuit] have focused on three points: (1) an injury caused by the debtor (2) willfully and (3) maliciously." *First Weber Group, Inc. v. Horsfall*, 738 F.3d 767, 774 (7th Cir. 2013) (citations omitted).

W.      Injury "is understood to mean a 'violation of another's legal right, for which the law provides a remedy.'  The injury need not have been suffered directly by the creditor asserting the claim.  The creditor's claim must, however, derive from the other's injury." *Id.* (internal citations omitted).

X.      "Willfulness requires 'a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury.' " *Id.* (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (emphasis in original)).  " 'Willfulness' can be found either if the 'debtor's motive was to inflict the injury, or the debtor's act was substantially certain to result in injury.' " *Id.* (quotation omitted).

Y.      Maliciousness requires the debtor to act "in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994) (quotation omitted).  The Seventh Circuit recently

reaffirmed its definition of maliciousness from *Thirtyacre* as good law. *Horsfall*, 738 F.3d at 774-75.

Z.    "Generally, debts for breach of contract are not excepted from discharge under § 523(a)(6)". *In re Lazzara*, 287 B.R. 714, 722 (N.D. Ill. 2002) (citations omitted). "Such a debt will be dischargeable, unless the breach was accompanied by conduct resulting in willful and malicious injury." *Id.*

### *Issue-Track, Win-Tec, Debtor's Computer and Google Domain Emails*

AA.    LMS alleged that Debtor willfully and maliciously injured LMS by changing passwords, refusing to turn over passwords or otherwise preventing LMS's access to Issue-Track, Win-Tec, Debtor's Computer and the Google Domain emails following Debtor's termination.

1.    LMS could not access Issue-Track, Taco Bell's online vendor portal for a period of one-two weeks following Debtor's termination.

    a.    LMS has not proven that Debtor improperly prevented LMS from accessing Issue-Track. At any time following Debtor's termination, LMS could have reset the password by contacting Taco Bell directly. The delay in LMS's re-gaining access to Issue-Track was based on LMS's staff's decision to prioritize other work responsibilities as more important at that time than re-gaining access to Issue-Track.

2.    LMS could not access Win-Tec (LMS's dispatching software), which was loaded on Debtor's Computer, for approximately two days following Debtor's termination, and could not access Debtor's Computer for approximately five days following Debtor's termination.

    a.    LMS has not proven that Debtor improperly prevented LMS from accessing Win-Tec. During the two-day period following Debtor's termination in which LMS did not have access to Win-Tec, LMS was not prevented from dispatching technicians on service

calls using other methods, such as the telephone, and LMS could have, and did, re-gain access to Win-Tec by contacting Win-Tec directly.

          b.      LMS has not proven that Debtor improperly prevented LMS from accessing Debtor's Computer. Other than requesting the "immediate[] return [of] all Company equipment and all Company information to which you have possession or access" in the termination letter, LMS took no step on the day of Debtor's termination to get the password to Debtor's Computer before Debtor left LMS's building. It would not be reasonable for LMS to expect that, in the course of being terminated, Debtor would have the presence of mind to offer, unprompted, the password to Debtor's Computer.

          3.      LMS could not access its Google Domain emails for approximately one year following Debtor's termination, and when it did gain access many emails appear to have been deleted.

          a.      LMS has not proven that Debtor improperly prevented LMS from accessing the Google Domain emails or that Debtor deleted emails. Debtor was the administrator of the Google Domain emails, and the password was last changed on the date Debtor was terminated. However, Debtor was the only LMS employee who consistently and primarily used his Google Domain email. Lamb, Wilson and others used their respective "@hotmail.com" email addresses in addition to their respective Google Domain email. LMS has not proven any damages it suffered because it did not have access to the Google Domain emails.

          4.      LMS has not proven that Debtor willfully and maliciously injured LMS based on LMS's inability to access Issue-Track, Win-Tec, Debtor's Computer or the Google Domain emails following Debtor's termination or that LMS suffered any compensable damages based thereon. Therefore, LMS is not entitled to a judgment of nondischargeability for damages related thereto.

*LMS's Relationship with Taco Bell; Non-Solicitation and Non-Compete Clauses*

BB.     LMS alleged that Debtor willfully and maliciously injured LMS by causing

Taco Bell to stop working with LMS (*see* Finding of Fact ¶¶ 46(d) and (e)).

CC.     Businesspeople often spend years developing and building client relationships.

It is unsurprising that when an individual is terminated from a business, the client will follow

that individual to their next place of business.  At the heart of this dispute is the fact that, prior

to Debtor's employment by LMS, Taco Bell was a "relationship client" of Debtor's.

1.     When Debtor was hired by LMS, LMS expected Debtor to bring Taco

Bell work to LMS, and he did.  It was entirely foreseeable, then, that once Debtor was

terminated, Taco Bell work could diminish or stop unless other employees of LMS built

positive business relationships with representatives of Taco Bell.  No other LMS employees

apparently sufficiently built such relationships to sustain the Taco Bell business.

2.     LMS attempted to protect itself from Taco Bell following Debtor to

Debtor's next place of employment with non-compete and non-solicitation clauses in the

Employment Agreement, but these clauses do not change the underlying fact that LMS's

relationship with Taco Bell was an "at will" relationship.

3.     There was no contract between LMS and Taco Bell, and Taco Bell could

stop working with LMS at any time for any reason.  After Debtor's termination, Taco Bell

continued to give work to LMS for a period of time, though not at the level LMS enjoyed while

Debtor was employed at LMS.

4.     There was evidence pointing to a variety of reasons for the decrease in

Taco Bell business after Debtor's termination (Debtor's actions, performance issues and Taco

Bell's desire to remain neutral in the dispute between LMS and Debtor), all of which are

plausible and likely contributors to the loss of Taco Bell business.

5.      Even though Debtor's actions could have played a role in the decrease of Taco Bell business, the Court concludes that LMS has failed to sustain its burden to prove by a preponderance of the evidence that Debtor willfully and maliciously injured LMS by causing a reduction in the work LMS performed for Taco Bell after Debtor's termination.  Therefore, LMS is not entitled to a judgment of nondischargeability for damages related to the loss of business from Taco Bell or the idle trucks and equipment.

DD.    The Court concludes that LMS was not injured by, and suffered no damages as a result of, Debtor's attempts to recruit LMS employees to join him in forming a new company because no employees left LMS for this purpose.

EE.    The Court concludes that LMS was not injured by, and suffered no damages as a result of, Debtor's working for competitors of LMS because LMS presented no evidence that Taco Bell left LMS for Debtor's subsequent employers.

***Treble Damages***

FF.     LMS has asserted that it is entitled to treble damages pursuant to the Crime Victim's Relief Act ("CVRA"), Ind. Code § 34-24-3-1, which provides

> If a person has an unpaid claim on a liability that is covered by IC 24-4.6-5 or suffers a pecuniary loss as a result of a violation of IC 35-43, IC 35-42-3-3, IC 35-42-3-4, IC 35-45-9, or IC 35-46-10, the person may bring a civil action against the person who caused the loss for the following:
> (1)  An amount not to exceed three (3) times:
>      (A)  the actual damages of the person suffering the loss, in the case of a liability that is not covered by IC 24-4.6-5;  . . .
> (2)  The costs of the action.
> (3)  A reasonable attorney's fee.

GG.    Based on the Court's findings and conclusions above, LMS does not have a claim for treble damages.  LMS has not sustained its burden to prove that all of the necessary elements of any predicate crime (including the requisite *mens rea*) was committed by Debtor and/or that LMS suffered a pecuniary loss thereby.

*Pre-Judgment Interest*

HH.    LMS has asked the Court to award 6% pre-judgment interest pursuant to Ind.

Code § 34-51-4 *et seq.* from and after January 20, 2019, the date that is fifteen months after

Debtor's termination date.  Ind. Code § 34-51-4-1 provides:  "This chapter applies to any civil

action arising out of tortious conduct."

II.    The Court will consider awarding pre-judgment interest with respect to the

judgment that will be entered to recover unauthorized commissions.  Counsel for LMS may file a

brief setting forth its argument for payment of interest and supporting case law within 15 days

after these findings of fact and conclusions of law are entered.  Debtor shall have 7 days

thereafter to file a response.  The Court will determine if a hearing is necessary after considering

the written submissions and, if so, will set such hearing by separate notice.

*Attorney Fees*

JJ.    Both parties have asked the Court to award attorney fees.  At the Trial, the Court

reserved ruling on either party's request for attorney fees until the Court "decide[s] whether or

not the Court's going to award any attorneys fees".[119]

KK.    "Under the American Rule, 'the prevailing litigant is ordinarily not entitled to

collect a reasonable attorneys' fee from the loser.' " *Travelers Cas. And Sur. Co. of America v.*

*Pacific Gas and Elec. Co.*, 549 U.S. 443, 448, 127 S.Ct. 1199, 1203 (2007), quoting *Alyeska*

*Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 246, 95 S.Ct, 1612 (1975).  The

American Rule "can be overcome by statute…[and] also be overcome by an 'enforceable

contract' allocating attorney's fees." *Travelers*, 549 U.S. at 448, quoting *Fleischmann Distilling*

*Corp. v. Maier Brewing Co.*, 386 U.S. 714, 717, 87 S.Ct. 1404 (1967).

---

[119]    Transcript of Record Day 3 at 145:4-15 [The Court].

LL.    There are three possible bases for an award of attorney fees in this adversary proceeding:  (1) Fed. R. Bankr. P. 9011 ("Rule 9011"); (2) the CVRA; and (3) the Employment Agreement.

MM.    Under Rule 9011(b), an attorney "certif[ies] that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances … the claims, defenses, and other legal contentions therein are warranted by existing law …". Under Rule 9011(c), the Court may "impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation."

NN.    Debtor's claim for attorney fees seems to be rooted in Rule 9011.[120]  The Court concludes that an award of attorney fees to Debtor is not warranted.  Having heard the evidence at Trial, the claims made on behalf of Lamb and Wilson, as well as under §§ 523(a)(2)(B) and 727, were not unwarranted even though they were ultimately unsuccessful.  Therefore, an award of attorney fees is not appropriate for Debtor.

OO.    LMS's claim for attorney fees seems to be rooted in the CVRA and the Employment Agreement.  Because the Court concluded that LMS was not entitled to relief under the CVRA, the Court will not award attorney fees thereunder.

PP.    "[A] contractual provision entitling a creditor to recover attorney's fees may be enforced in a dischargeability action if the provision is valid under state law."  *Sheridan*, 105 F.3d at 1166, citing *In re Mayer*, 51 F.3d 670, 667 (7th Cir. 1995).  Under Indiana law, where "an award of fees is premised on a contractual provision, the agreement will be enforceable only

---

[120]    "[T]he Bankruptcy Code specifies a single instance in which a prevailing debtor may recover the fees incurred in a dischargeability action – where the creditor's challenge to the dischargeability of a consumer debt was not substantially justified." *Matter of Sheridan*, 105 F.3d 1164, 1167 (7th Cir. 1997) (citing § 523(d)).  The debts at issue in this adversary proceeding are not consumer in nature.  Thus, Debtor is not entitled to attorney fees pursuant to § 523(d).

in accordance with its terms and only if it does not violate public policy." *H & G Ortho, Inc. v. Neodontics Int'l, Inc.*, 823 N.E.2d 734, 737 (Ind. Ct. App. 2005) (citation omitted).

QQ.    The attorney fee provision at issue in this adversary proceeding appears in section 19 of the Employment Agreement: "[LMS] shall be entitled to an award of all costs and attorneys' fees incurred by it in any attempt to enforce the terms of this Agreement."[121]  This provision is much broader than is typically seen in that it does not require that LMS prevail in its efforts to enforce the Employment Agreement.

RR.    Nonetheless, the Court believes that LMS has successfully enforced the Employment Agreement with respect to recovery of the unauthorized commissions.  Therefore, the Court will award attorney fees that were reasonably related to the prosecution of LMS's claim to recover the unauthorized commissions.  Counsel for LMS may file an affidavit establishing with detail the time spent with respect to the commissions claim within 15 days after these findings of fact and conclusions of law are entered.  Debtor shall have 7 days thereafter to file a response.  The Court will determine if a hearing is necessary after considering the written submissions and, if so, will set such hearing by separate notice.

## Decision

Based on the foregoing, the Court hereby concludes that:

- Judgment will be entered in favor of LMS and against Debtor in the amount of $39,034 with respect to its claim regarding commissions and determining that such judgment is excepted from Debtor's discharge under § 523(a)(2)(A),[122] and in favor of Debtor and against LMS with respect to all remaining claims under § 523(a)(2)(A).

---

[121]    LMS's Ex. 3; Debtor's Ex. A.

[122]    If the Court determines that pre-judgment interest is due and payable to LMS after considering the parties' submissions as described in Conclusion of Law ¶ II, the Court will add such interest in the judgment to be entered.

- Judgment will be entered in favor of Debtor and against LMS with respect to its claims under §§ 532(a)(4) and (6).

- Debtor will bear his own attorney fees and related expenses.

- LMS will bear its own attorney fees and related expenses with the exception of reasonable attorney fees related to the commissions claim.[123]

The Court will enter judgment consistent with these findings of fact and conclusions of law contemporaneously with the subsequent entry of its order(s) on pre-judgment interest and LMS's attorney fees.

IT IS SO ORDERED.

# # #

---

[123]    After considering the parties' submissions as described in Conclusion of Law ¶ RR, the Court will add LMS's reasonable attorney fees related to the commissions claim in the judgment to be entered.